UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

*FILED*

2004 JUL 16 A II: 10

U.S. DISTRICT COURT
HARTFORD, CT.

| | | |
|---|---|---|
| IGNATIUS UMEADI OKONKWO<br>Petitioner, | | |
| —vs— | 3:02-CV-01733 | |
| JOHN ASHCROFT, ET. AL.,<br>Respondents, | Alvin W. Thompson | |

=================================================================

### OKONKWO'S SECOND MOST CURRENT STATUS REPORT

=================================================================

Petitioner, Ignatius Umeadi Okonkwo, hereby submits
this Second most current status report, to apprise the court about
the recent development in his case at the administrative level.

In support thereof, Petitioner states as follows:

1. On April 14, 2004, petitioner was deported "in absentia,"
although he was scheduled for a removal hearing on April 30, 2004.
He was nonetheless ordered deported on April 14, 2004.

2. On or about April 27, 2004, Petitioner filed a Notice
of Appeals from the a decision of the immigration judge dated
April 14, 2004.

3. On Tuesday, April 27, 2004, around 9:30am, Central
time, Mrs. Wilson, an ICE Deportation officer came and spoke to the
Petitioner encouraging him to waive his right to appeal and allowed
to be deported.

4. On or about May 4, 2004, Petitioner received a filing
report for appeal, from the the Board of Immigration Appeals
acknowledging the receipt of his appeal and a fee waiver.

-1-

See Exhibit 1- Filing Receipt of Appeal.

5. On or about May 6, 2004, Thursday, around 10:00 am central time, a Mr. Boeleans, who claimed to be my deportation officer came and advised me that "If I don't want to appeal my case, to sign my deportation"

6. On or about May 18, 2004, Tuesday around 1:00PM Central time, petitioner was given a "Diesel Theraphy", move from federal Detention Center, Oakdale, Louisiana, to federal Correctional Institution, (FCI), a facility designed only for conviction criminals, like murderer, rapist etc.

7. On May 19, 2004, petitioner notified this Honorable Court the Government and the BIA of his change of address.

8. On or about June 4, 2004, petitioner called the Board of Immigration Appeals, and spoke to a lady named Mrs. Jackson and requested whether they receive the Notice of Change of Address and whether they have sent him a briefing schedule. She told the Petioner, that they received the Notice of Address Change, but no briefing schedule has been sent out.

9. On or about June 7, 2004, Monday, around 12:15 PM Central time, petitioner called the Honorable Court and spoke to one of the Clerks,  Ms. Barbara, to inquire whether his Notice of Change of address was received by the court and whether the Government has filed the response which was due on June 1st, 2004. She told me the Court received my Notice of Address Change and that the Government has requested for its fourth Enlargement of time to October 1st, 2004. I advised her that I am going to file an objection to the Government's response.

10. On June 7, 2004, this Honorable Court granted the Government's 4th motion for enlargement of time, nunc pro tunc, to and including,

October 1st, 2004.

11. On June 23, 2004, Wednesday, around 2:45 PM Central time, was called in to R & D (receving and Discharge) to pack all his property that he will be moving on June 24, 2004.

12. On June 25, 2004, the petitioner notified this Honorable Court the government and the BIA of his new change of address.

13. On June 29, 2004, Petitioner filed a Motion to reconsider to oppose the Government's fourth motion for enlargement of time, or to reduce the enlargement of time to twenty days, failure to comply to issue writ releasing petitioner from Five years unlawful detention.

14. On June 29, 2004, Tuesday around 2:45 PM Central Time, petitioner called the BIA and spoke to a Ms. Williams, who put him on hold and later transferred him to a Ms. Walker. Petitioner was informed that there is no indication that his Notice of Address Change was received, and his briefing schedule was sent to his old address. On June 23, 2004, the same day, petitioner was bag and baggage to be transferred. Ms. Walker also told petitioner when his new change of address show up in the system, that she will send petitioner a new briefing schedule.

15. On the same day June 29, 2004, Petitioner sent out another Notice of new change of address, by certified mail, and Return Receipt and attention it to Mrs. Walker, to the Board of Immigration Appeals. (See the certified Receipt number #7000-1530-0001-2694-9544).

16. On July 3, 2004, petitioner requested for twenty one days extension of time to and including August 2, 2004, to file his brief on appeal to the BIS, and attention it to Mrs. Walker because it is better to be late than to be let, because had I known always come at last. Since I have not yet receive my briefing schedule. (See Exhibit "2" , the letter for extension of time.)

17.    On July 5, 2004, Petitioner send his brief on appeal the Board of Immigration Appeals by Certified Mail and Return Receipt and attention it to Mrs. Walker, irrespective, that petitioner have not receive his briefing schedule. Since the board claimed that they sent on my old address, in Federal Correctional Center, Oakdale, Louisiana on June 23, 2004; However, I only have twenty one days to response from the day it was sent and was due on July 13, 2004. (See Exhibit the certified receipt - #7000-1530-0001-2692-2516).

18.    On July 7, 2004, petitioner received the government Motion for Summary Affirmance, dated July 1, 2004, (See it as Exhibit "3").

19.    On July 11, 2004, Petitioner filed opposition to government Motion for Summary Affirmance, dated July 1, 2004.

20.    On or about July 9, 2004, the long awaiting briefing schedule from the Board of Immigration Appeals was received. The Board erroneously gave petitioner, another person's Removal Proceedings Brief, with Petitioner's name on the first page. (See it as Exhibit "4"). In addition, page 94 of my transcript that was sent to me by the Board was also missing. To be informed. this is not the first time it happened. It has happened three times now. That is, part of delay tactics, to perpetually proceedings this case, to frustrate Petitioner.

21.    On July 11, 2004, petitioner send out another brief of the same, he sent to the Board, on July 5, 2004, by Priority Mail and Return Receipt (See the enclosed return Receipt #7000-1530-0001-2694-9506),irrespective that he has wrong removal proceedings brief and incomplete transcript, sent to him by the Board. (See the Notice as Exhibit "5").

**S E E * E X H I B I T * " 1 "**



U.S. Department of Justice

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

*5201 Leesburg Pike, Suite 1300*
*Falls Church, Virginia 22041*

**OKONKWO, IGNATIUS UMEADI**
**INMATE #: 16057-265   A# 26-792-202**
**INMATE HOUSING: FDC**
**FDC, P. O. BOX 5010**
**OAKDALE, LA 71463-0000**

INS-Litigation Unit/OAK
P.O. Box 1128
Oakdale, LA 71463-1128

**Name: OKONKWO, IGNATIUS UMEADI**

A26-792-202

**Type of Proceeding: Removal**

**Date of this notice: 04/30/2004**

**Type of Appeal: Case Appeal**

**Filed by:  Alien**

### FILING RECEIPT FOR APPEAL

The Board of Immigration Appeals acknowledges receipt of your appeal and fee or fee waiver request (where applicable) on 04/29/2004 in the above-referenced case.

**PLEASE NOTE**·

In all future correspondence or filings with the Board, please list the name and alien registration number ("A" number) of the case (as indicated above), as well as all of the names and "A" numbers for <u>each</u> family member who is included in this appeal.

If you have any questions about how to file something at the Board, you should review the Board's Practice Manual and Questions and Answers at www.usdoj.gov/eoir.

<u>Proof of service on the opposing party at the address above is required for ALL submissions to the Board of Immigration Appeals</u> -- including correspondence, forms, briefs, motions, and other documents.   If you are the Respondent or Applicant, the "Opposing Party" is the District Counsel for the DHS at the address shown above.  Your certificate of service must clearly identify the document sent to the opposing party, the opposing party's name and address, and the date it was sent to them.  <u>Any submission filed with the Board without a certificate of service on the opposing party will be rejected</u>.

S E E * E X H I B I T * " 2 "

Ignatius Okonkwo
#A26-792-202
Etowah County Detention Center
827 Forrest Avenue
Gadsden, AL. 35901

July 3rd, 2004.

Attn. Ms. Walker
Board of immigration Appeals
Office of the Clerk
5201 Leesburg Pike, Suite 1300
Falls Church, VA. 22041.

RE: REQUEST FOR TWENTY ONE DAYS EXTENSION OF TIME TO AND INCLUDING AUGUST 2, 2004,
~~2, 2004, TO~~ FILE BRIEF ON APPEAL TO THE BIA
    IN THE MATTER OF IGNATIUS OKONKWO, ALIEN FILE NO. A26-792-202

Dear Ms. Walker:

Please be advised that I have not yet received from the Board my Briefing
schedule, due to my recent transfer and/or change of address.

Following my conversation with you on June 29, 2004, I sent a second 'Notice
of Change Address' to your attention.

However, because of the uncertainty as to when or whether you will receive my
second change of address notice, and the fact that I have not yet received
the briefing schedule which you sent to my old address in Oakdale, Louisiana,
I am respectfully asking this Honorable office to grant me a twenty one days
extention of time from the original briefing due date, to and includingf
August 2nd, 2004, to submit my brief on appeal to the BIA.

Prompt attention to this matter will be highly appreciated.

Thank you for your time and consideration of this matter.

Respectfully Submitted

Ignatius Umeadi Okonkwo

cc: INS Litigation Unit/OAK
    P.O. Box 1128
    Oakdale, LA. 71463-1128

S E E * E X H I B I T * " 3 "

Jerry A. Beatmann                            +                    **DETAINED**
Assistant Chief Counsel
Department of Homeland Security
United States Immigration and Customs Enforcement
OAKDALE DISTRICT OFFICE
1010 East Whatley Road
Oakdale, LA 71463


## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## BOARD OF IMMIGRATION APPEALS

---

In the Matter of:

Ignatius Umeadi OKONKWO                          A26 792 202

In removal proceedings

---

## DEPARTMENT OF HOMELAND SECURITY MOTION FOR SUMMARY AFFIRMANCE

The Department of Homeland Security, Bureau of Immigration and Customs Enforcement (the "Department") requests that the Board of Immigration Appeals summarily affirm the written decision of the Immigration Judge rendered on April 14, 2004, pursuant to 67 Fed. Reg. 54,878, 54,903 (2002) (to be codified at 8 C.F.R. § 3.1(e)(4)(i)). The Department submits that the decision of the Immigration Judge was correct in all material aspects; that, assuming arguendo, any errors do exist in the decision, they are harmless or immaterial; and that the respondent's appellate arguments are not so substantial that the case warrants the issuance of a written opinion. 67 Fed. Reg. At 54,903 (to be codified at 8 C.F.R. § 3.1(e)(4)(i)(B)).

The Department agrees with the Immigration Judge that the respondent is inadmissible as charged as an alien convicted of a crime involving moral turpitude and as an alien not in possession of a valid entry document. Therefore, the Immigration Judge's decision to order the respondent removed to Nigeria is correct in all respects.

In the alternative, should the Board determine that summary affirmance of the Immigration Judge's decision is not appropriate; the Department submits that none of the six circumstances warranting review by a three-member panel are present in this case, and that the Immigration Judge's decision should otherwise be affirmed by means of a brief order. 67 Fed. Reg. At 54,903 (to be codified at 8 C.F.R. §§ 3.1(e)(5) and (6).

Respectfully submitted,

July 1 2004
‾‾‾‾‾‾‾‾‾‾‾‾
Date

Jerry A. Beatmann
Assistant Chief Counsel
Department of Homeland Security
Bureau of Immigration & Customs Enforcement
1010 East Whatley Road
Oakdale, LA 71463
(318) 335-0713, Ext. 142

## PROOF OF SERVICE

Alien Name:  Ignatius Umeadi Okonkwo

Alien Number: A26 792 202

On the 1st day of July 2004, I, Jerry A. Beatmann, mailed, via first class postage, in the United States mail, a copy of this appeal brief to the respondent at the following address:

>   Ignatius Umeadi Okonkwo
>   BOP# 16057-265
>   Etowah County Jail
>   827 Forest Ave.
>   Gadsden, AL 35901-0000

Jerry A. Beatmann
Assistant Chief Counsel

NOTE:  On or about June 24, 2004, the respondent was transferred to the Etowah County Jail, 827 Forest Ave., Gadsden, AL 35901.

S E E * E X H I B I T * " 4"

# UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## IMMIGRATION COURT
## OAKDALE, LOUISIANA

**FILE:** A26 792 202

I certify that ~~~~ ~~~~~ of this document
have ~~~~~ ~~~~~ ~~ c~ ~~iles by
~~~~~~~~ ~~~~~~
(Date)                    (Clerk)

**IN THE MATTER OF:**

Ignatius Umeadi OKONKWO a/k/a Nwankeona Chukwuduben a/k/a Musa MOHAMMED

**RESPONDENT IN REMOVAL PROCEEDINGS**

**CHARGES:**      Section 212(a)(2)(A)(i)(I) of the Immigration and Nationality Act; an alien
convicted of, or who admits having committed, or who admits
committing acts which constitute the essential elements of a crime
involving moral turpitude (other than a purely political offense).

Section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act, an
immigrant who at the time of application for admission is not in
possession of a valid unexpired immigrant visa, reentry permit, border
crossing identification card, or other valid entry document.

**APPLICATIONS:**      Termination.

Cancellation of removal under section 240A(a) of the Immigration and
Nationality Act.

Cancellation of removal under section 240A(b) of the Immigration and
Nationality Act.

A waiver under section 212(h) of the Immigration and Nationality Act.

Voluntary departure.

1

**ON BEHALF OF RESPONDENT**
Steven A. Morley, Esq.
Morley Surin & Griffin, P.C.
Constitution Place
325 Chestnut Street, Suite 1305-P
Philadelphia, PA 19106

**ON BEHALF OF DHS**
William E. Lore, Esq.
Assistant Chief Counsel, DHS
York County Prison Field Office
3400 Concord Road
York, PA 17402

## MEMORANDUM OF DECISION AND ORDER

### I.    Procedural History

Respondent is a twenty-three year old male, native and citizen of Russia. On March 11, 1994, Respondent was admitted to the United States as a refugee. His status was adjusted to that of lawful permanent resident on May 3, 1995. Subsequently, on May 23, 2002, the Department of Homeland Security (Government) issued Respondent a Notice to Appear (NTA) alleging the following: (1) that Respondent is not a citizen or national of the United States; (2) that Respondent is a native and citizen of Russia; (3) that Respondent was admitted to the United States at Philadelphia, Pennsylvania on or about March 11, 1994 as a refugee; (4) that Respondent adjusted status to that of lawful permanent resident on May 3, 1995 under section Public Law 96-212;  (5) that on June 18, 2001, Respondent was convicted in the Philadelphia Court of Common Pleas for the offenses of Robbery and Criminal Conspiracy, in violation of **Pennsylvania Criminal Codes 3701 and 903**; (6) that Respondent was sentenced to a term of imprisonment of not less than two years and not more than four years for the robbery conviction; (7) that on June 18, 2001, Respondent was convicted in the Philadelphia Court of Common Pleas for the offenses of Robbery, Aggravated Assault and Criminal Conspiracy, in violation of **Pennsylvania Criminal Codes 3701, 2702, and 903**; (8) that for this conviction Respondent was sentenced to a term of imprisonment of not less than 4 ½ years to no more than 10 years. (Robbery 2-4 years, Aggravated Assault 4 ½ to 10 years, Criminal Conspiracy 5 years of probation); (9) that on June 18, 2001, Respondent was convicted in the Philadelphia Court of Common Pleas for the offense of Receiving Stolen Property, in violation of **Pennsylvania Criminal Code 3925**; and (10) that these crimes did not arise out of a single scheme of misconduct.

2

The NTA charges Respondent with removability pursuant to INA § 237(a)(2)(A)(iii), as amended, in that at any time after admission, he was convicted of an aggravated felony as defined in **section 101(a)(43)(F)** of the Act, a crime of violence (as defined in section 16 of Title 18, United States Code, but not including a purely political offense) for which the term of imprisonment ordered was at least one year; **INA § 237(a)(2)(A)(iii)**, as amended, in that at any time after admission, he was convicted of an aggravated felony as defined in **section 101(a)(43)(G)** of the Act, a law relating to a theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment imposed was at least one year; **INA § 237(a)(2)(A)(ii)**, as amended, in that at any time after admission, he was convicted of two crimes involving moral turpitude not arising out of a single scheme of misconduct; and **INA § 237(a)(2)(A)(iii)**, as amended, in that at any time after admission, he was convicted of an aggravated felony as defined in **Section 101(a)(43)(U)** of the Act, a law relating to an attempt or conspiracy to commit an offense described in **section 101(a)(43)** of the Act.

At a Master Calendar Hearing held on December 19, 2002, oral amendments were made to allegations six and eight of the charging document. Respondent admitted allegations one through ten, as amended, and conceded all four charges of removability. In the event of removal, Respondent declined to designate a country and the Court designated Russia at the request of the Government. At an Individual Hearing held on December 18, 2003, the parties agreed that due to his convictions, Respondent's only available relief is Deferral of Removal pursuant to **Article 3 of the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman or Degrading Treatment or Punishment (Convention Against Torture)**. Respondent submitted form I-589 requesting same. The Court reserved its decision to further review the testimony and evidence presented. The Court's decision and order follow.

II.    **Evidence Presented**

A.    **Testimony**

*Testimony of Respondent*

Respondent testified that he was born in Chechnya. He came to the United States in 1994

3

at the age of thirteen. Respondent stated that he lived in St. Petersburg for two years prior to moving to the United States. Before that, he lived in Groznyy, Chechnya. Respondent stated that his only family member currently living in Russia is his maternal grandmother, but that she is planning to permanently relocate to the United States soon. He added that he also has an uncle who lives in Russia but that they are not in contact with one another. Respondent stated that he has not returned to Russia since his arrival in 1994.

Respondent testified that his father is Jewish and that his mother is Christian. He stated that he was not raised in any particular faith. He indicated that Jews in Russia are often ashamed of their religion and that is why Respondent's parents never discussed Judaism with him. Respondent testified that he learned that he was Jewish when he was in the first grade. He stated that a neighbor told him he was Jewish and that he denied it. Respondent stated that when he was seven years old, some parents would not allow him to play with their children. At the time, he did not know why. According to Respondent, people in St. Petersburg did not want Chechens living there. Respondent stated that people made fun of him due to his dark complexion and that they told him to "go back to where you came from."

Respondent indicated that his parents never told him why they came to the United States, but that he understood that his parents "wanted safety." Respondent testified that he has been convicted of Conspiracy to Commit Robbery and Aggravated Assault. For these offenses, Respondent received a sentence of 4 ½ to 10 years with 5 years probation. Respondent testified that he began using drugs at the age of fifteen and that he was placed on probation after being caught with drugs at school. As a consequence of violating his probation, Respondent was ordered to attend drug rehabilitation. He testified that he has sought treatment for his drug problem but that he cannot be sure whether treatment has been successful until he is released from prison.

Respondent testified that he did not practice any religion when he came to the United States. He stated that he does not know whether his father practiced Judaism, but that his paternal grandfather goes to synagogue every Saturday. Respondent stated that he lived with his paternal grandparents in Chechnya until he was 8 years old. At that time, his mother lived alone and his father worked in St. Petersburg. Although Respondent observed his grandparents celebrating

4

Jewish holidays and speaking Yiddish, he never asked his grandparents about these rituals.

According to Respondent, he has only attended synagogue once since coming to live in the United States. He stated that as a youth, he went to the Jewish Center where he met friends and played sports.

On cross examination, Respondent stated that his maternal grandmother lives in Tula. He indicated that he does not know where that town is located. Respondent further testified that he does not know where is uncle lives.

According to Respondent, three Russian boys attacked him in St. Petersburg in 1992 or 1993. Respondent testified that the boys asked him where he was from and Respondent replied that he came from a town in Chechnya. Respondent believes that he was attacked because he is Chechen. When asked to describe the boys who attacked him, Respondent stated that they were taller and older than he was. During his time in St. Petersburg, Respondent stated he did not know anyone else who had a dark complexion. He stated that in Chechnya, he had Jewish neighbors who lived across the street but that the family did not attend synagogue. Respondent stated that as a child he told these neighbors that he was not Jewish. Respondent indicated that anyone who is not Muslim and Chechen will experience problems living in Chechnya.

*Testimony of Yuriy Kolkevich, Respondent's Father*

The witness testified that he is 43 years old and that he was born in Russia. He came to the United States on March 11, 1994 as a refugee but is now a naturalized U.S. citizen. He stated that his wife, Respondent and one other child accompanied him here.  The witness testified that he was admitted to the United States on "religious grounds," adding that in Chechnya he was persecuted because of his religion, Judaism. The witness stated that he was raised Jewish and that his family celebrated Jewish holidays. He indicated that he did not raise his children in the Jewish faith because he did not want his children to experience any problems as a result. The witness stated that because of his Jewish heritage, he was not allowed to attend University. Therefore, he was forced to bribe someone into changing the nationality/ethnic group in his passport to Belorussian. Mr. Kolkevich testified that after graduation from college, he continued to experience problems because of his religion. He stated that he worked as a city inspector for

between five and seven years. When the director was replaced by a Chechen national, the witness was fired. He believes that he lost his job because of his Jewish and Russian background and because the director wanted to "bring in his own men."

In 1990, Mr. Kolkevich moved to St. Petersburg to pursue employment opportunities. He continued to experience serious problems there. First, he could not obtain a residence permit without a job and he could not obtain a job without a residence permit. More importantly, the witness was unable to enroll his children in school. When potential employers saw that the witness was from Chechnya, he was told that they wished to avoid problems and could not hire him.

The witness stated that he never had any problems as a result of his physical appearance while living in St. Petersburg. He indicated, however, that he did experience several problems as a result of being from Chechnya. These included his inability to get a job because of discrimination and his difficulty in obtaining a driver's license. The witness stated that although he did not have problems as a result of being Jewish, his parents experienced many problems over the years. Mr. Kolkevich indicated that his neighbors in St. Petersburg did not know that he was Jewish. In Chechnya, however, his neighbors knew that he was Jewish. The witness testified that his wife's mother remains in Russia, but that she will be moving to the United States permanently. He indicated that there is no one else in Russia who could act as a support system for Respondent. The witness stated that he has never returned to Russia since coming here in 1994.

On cross examination, the witness stated that he is a U.S. citizen. He stated that he and his wife naturalized approximately two years ago. He testified that he was required to produce his passport during his interview with U.S. officials but that he no longer has it. The witness stated that his first passport, before it was changed, indicated that he was Jewish. He testified that his birth certificate does not show his religion, adding that he does not know if his wife has a birth certificate. Mr. Kolkevich stated that his driver's license indicated that he was from Chechnya, but that it did not contain any reference to his religion. When asked to name the Jewish holidays, Mr. Kolkevich stated, "Rosh Hoshana, Hanukkah, and Yom Kippur." He added that Hanukkah will begin on December 19th and that his mother died on Yom Kippur, in October.

6

The witness stated that he only attends synagogue on the holidays. He added that his father belongs to a synagogue but that he does not know its name. The witness stated that a rabbi presided over his mother's funeral. The witness testified that his son was not aware of his Jewish heritage as a child. When questioned as to why he would deny his son his Jewish heritage, the witness stated that he simply wanted to protect him.

### Testimony of Nickolai Butkevich, Expert Witness

Subsequent to a voir dire by the Government, the Court qualified Mr. Butkevich as an expert witness. Mr. Butkevich testified that he works as the Research and Advocacy Director for the Union of Councils for Jews in the Former Soviet Union. He stated that his organization publicizes the experiences of Jews in the former Soviet Union in an effort to mobilize the United States Government to pressure the former Soviet government to address the problems. Mr. Butkevich stated that he has provided affidavits in about a dozen cases and that he has testified twice in Immigration Court. He indicated that the State Department regularly cites his research in their Human Rights Reports.

When questioned by the Government, the witness stated that he has never testified on behalf of the United States Government and conceded that his website is marketed to immigration attorneys. Mr. Butkevich indicated that the report on Russia that he provided to the Court is from 2001 but added that he is currently drafting the 2002-2003 report. The witness stated that Respondent is likely to be tortured and abused if returned to Russia. Due to his criminal convictions, Respondent would be vulnerable to being targeted by the police. The police would learn of his convictions from the Russian government who would have been notified by the U.S. government. Respondent would also be targeted for abuse because of his Jewish heritage. In the context of Russian society, Respondent would be thought of as darkly complected and from the Caucasus. As such, Respondent would be assumed to be "illegal" and would be targeted by the police seeking a bribe. If Respondent did not pay the bribe, he would be deported or incriminated in an open case. If he refused to confess, he would be tortured. The torture could range from beatings to electric shock to handcuffing Respondent and hanging him from a rafter. It might include beatings on the soles of his feet or use of the "elephant," a

7

technique where a bag is placed over a person's head and he is subjected to repeated beatings until he confesses.

The witness stated that Kolkevich is a common Jewish name in Belarus and in Poland and that Respondent would be targeted as a Jew. He indicated that anti-Semitism is generally linked to the economy and that currently, there is a "spike" in anti-Semitism. This is evidenced by the December 7, 2003 elections where one-third of the votes went to United Russia (Pro Kremlin party), another third to independents and the remaining third to a combination of neo-fascist parties, including the Liberal Democratic Party of Russia, Motherland and the Communist Party. The witness testified that all three neo-fascist parties blame Jews for Russia's problems, including the fall of the Soviet Union and the destruction of the Russian economy. As such, the forecast for Jews within Russia is very dangerous. The witness indicated that the number two man in the Communist Party has called Jews "bloodsuckers." He explained that the concern is that the Kremlin (President Putin) supported Motherland and is therefore in league with the neo-fascist parties. The witness testified that President Putin has awarded two anti-Semitic leaders with medals, adding that this sends a strong signal that President Putin is not serious when he condemns anti-Semitism. Mr. Butkevich stated that the current rise in anti-Semitism would further exacerbate an already dangerous situation for Respondent. In addition, the fact that Respondent is from Chechnya would also prove dangerous for him given recent terrorist activity in Chechnya. This could result in Respondent being disappeared by the Russian army or by Muslim Chechen terrorists.

On cross examination, the witness stated that the 2002 State Department Report portrays a better climate for Jews in Russia than is actually the case. He conceded that he has never been to Chechnya and that the last time he was in St. Petersburg was in 1994. Mr. Butkevich stated that Respondent appears to be Jewish and that people in Russia would identify him as such. He indicated that Respondent is darker than the average Russian and appears to be from the Caucasus. The witness testified that if Respondent were removed, the U.S. government would inform the Russian government of Respondent's criminal convictions. Therefore, there is a reasonable chance that the local authorities would learn of Respondent's criminal history.

The witness indicated that "registration" documents continue to be used by local

8

governments even though they have been outlawed by the Constitution. He stated that Respondent would be required to register in his locality if he wished to live there legally. After registering, he would be given an "internal passport." The witness testified that people from the Caucasus, including Jews and Roma, are discriminated against in Russia, particularly in Moscow and St. Petersburg. If Respondent returns to Chechnya, he would be in danger from the Russian army and from the paramilitary forces due to his age and the fact that he is male and has no family there to protect him. The witness testified that the Chechen rebels are extremely anti-Semitic and are trained to regard Jews as targets. During the first war, Jews were targeted by Muslim extremists both for their money as well as because of their ideaology.

When questioned as to why Respondent's father did not experience any problems while living in St. Petersburg in 1994-1995, the witness testified that there were reported incidents of anti-Semitism at that time and that anti-Semitism tends to be cyclical.

## B.    Documentary Evidence

The following exhibits were received and admitted into evidence:

**Exhibit 1:**
    A) Notice to Appear

**Exhibit 2:**
*Submitted by Government*
    A) Record of Deportable/Inadmissible Alien
    B) Memorandum of Creation of Record of Lawful Permanent Residence
    C) Court History of Respondent, Philadelphia, Pennsylvania
    D) Conviction Record, Philadelphia, Pennsylvania, no 0341, August 2000
    E) Conviction Record, Philadelphia, Pennsylvania, no 0342, August 2000
    F) Conviction Record, Philadelphia, Pennsylvania, no 1199, April 2001

**Exhibit 3:**
*Submitted by Respondent*
    A) Form I-589

**Exhibit 4:**
*Submitted by Government*
    A) U.S. Department of State Country Report on Human Rights Practices in Russia (2001)
    B) Background Notes for Russia (October 2002)

**Exhibit 5:**

*Submitted by Respondent*

      A) Notice of Entry of Appearance, Form EOIR-28

      B) Notice of Entry of Appearance, Form G-28

      C) Qualifications of the Expert, Nikolai Butkevich

      D) Anti-Semitism, Xenophobia and Religious Persecution in Russia's Regions 2001 Russian Regional Report from the Union of Councils for Jews in the Soviet Union

      E) Table of Contents I

            1) Snapshots of hate: experts from the report

            2) A Map of Russia's Administrative Regions

            3) Preface

            4) Frequently Used Abbreviations

            5) Executive Summary

            6) Southern Federal District

            7) Republic of Chechnya

            8) Endnotes for Southern Federal District

            9) Central Federal District

            10) Moscow (city)

            11) Moscow Oblast

            12) Endnotes for Central Federal District

            13) North-Western Federal District

            14) Leningrad Oblast

            15) Saint-Petersburg

            16) Footnotes for North-Western Federal District

    F) What's happening in Russia, News from the FSU (Former Soviet Union) monitor (Table of Contents II)

            17) St. Petersburg Police Count 5,000 Skinheads in City (October 30, 2003)

            18) Petersburg Skinhead Leader Arrested (October 30, 2003)

            19) Russian State Television Joins in Defamation Campaign Against Jehovah's Witnesses (October 30, 2003)

            20) Zhirinovsky Supports Malaysian Prime Minister's Statement on Jews "Ruling the World" (October 29, 2003)

            21) Leading Russian Anti-Semitic Paper Warned (October 29, 2003)

            22) Republic of Karelia Prosecutor Refuses to Bring Criminal Charges Against Rampaging Paratroopers for Central Federal District (October 27, 2003)

            23) Bigotry Monitor: volume 3, Number 42 (October 24, 2003)

            24) Skinheads Torch Car in Kalingrad, Get Slap on the Wrist in Vologda, Raise Police Concern in Sverdlovsk Region (October 22, 2003)

            25) Anti-Semitic Novgorod Editor Faces Retrial (October 15, 2003)

            26) Jewish Man Killed in Russia (October 15, 2003)

            27) Yeshiva Student Beaten in Russia (October 15, 2003)

            28) Bigotry Monitor: volume 3, Number 39 (October 3, 2003)

            29) Moscow Synagogue Guard Assaulted (October 1, 2003)

G) Certificate of Service

**Exhibit 6:**
*Submitted by Respondent*
    1) List of Witnesses

**Exhibit 7:**
*Submitted by Government*
    1) U.S. Department of State Country Report on Human Rights Practices in Russia (2002)
    2) Union of Councils for Jews in the Former Soviet Union: Services for Immigration Attorneys

**Exhibit 8:**
*Submitted by Respondent\**
    A) Respondent's Birth Certificate, with Translation
    B) Respondent's Father's Birth Certificate, with Translation
    C) Respondent's Grandfather's Birth Certificate, with Translation
    D) Respondent's Grandmother's Birth Certificate, with Translation
    E) Letter from Tabas House Synagogue
    F) Letter from Lubavitch Center for Russian Jewry
    G) Certificate of Service

**Exhibit 9:**
*Submitted by Government\**
    A) Report, dated February 3, 2004, of the Forensic Document Laboratory, including the documents examined and request for examination
    B) Government translation of previously submitted birth certificates

**Exhibit 10:**
*Submitted by Government\**
    A) I-590 registration for classification as refugee of Yuriy Kolkevich, claiming Russian nationality and Jewish ethnicity, and anti-Semitism as one motivation for seeking refugee status
    B) I-590 registration for classification as refugee of Marina Kolkevich, claiming Russian nationality and Jewish ethnicity, and anti-Semitism as one motivation for seeking refugee status
    C) I-590 registration for classification as refugee of Alina Kolkevich, claiming Russian nationality and part of family group
    D) Birth Certificate of Respondent
    E) Birth Certificate of Respondent's Father

\* The parties agreed to the submission of evidence subsequent to the conclusion of proceedings.

**II.    Position of the Parties**

    **A.    Respondent**

    Respondent argues that it is "more likely than not" that he will be tortured if returned to Russia. Respondent contends that as a criminal deportee without any family in Russia, he will be targeted for arbitrary arrests and torture. He further argues that he will be subject to torture because he is Chechen, as evidenced by his darker appearance. Finally, Respondent avers that he will be targeted for torture because he is Jewish, as evidenced by his surname and physical appearance.

    **B.    Government**

    The Government argues that Respondent has failed to show that it is "more likely than not" that he would be tortured if returned to Russia. The Government contends that it is highly speculative Respondent would be tortured because of his status as a criminal deportee, or his Jewish heritage, or his Chechen background.

**III.    Statement of Law**

    As previously discussed, the parties agree that Respondent's only available relief is Deferral of Removal under the **Convention Against Torture**. The Government opposes relief, and argues that Respondent has not established that it is "more likely than not" that he will be subjected to torture if returned to Russia.

    **A.    Regulatory Requirements for Deferral of Removal Pursuant to the Convention Against Torture and Relevant Precedent**

    The applicant for Deferral of Removal bears the burden of proving that it is "more likely than not" that he would be tortured if removed to the proposed country of removal. **See 8 C.F.R. § 1208.16(c)(2)**. As with Asylum, this burden can be established by testimony without corroboration, if the testimony is credible. **See id.; Matter of Y-B-, 21 I&N Dec. 1136, 1149-50 (BIA 1998)**. In assessing whether the applicant has satisfied his burden of proof, the Court must consider all evidence relevant to the possibility of future torture including: evidence of past

torture inflicted upon the applicant; evidence that the applicant could relocate to a part of the country of removal where he is not likely to be tortured; evidence of gross, flagrant, or mass violations of human rights within the country of removal; or other relevant information of conditions in the country of removal. **See** 8 C.F.R. § 1208.16(c)(3).

Finally, it must be noted that Deferral of Removal does not confer upon such alien any lawful, permanent immigrant status in the United States. In addition, such a grant will not necessarily result in the alien's release from Government custody. It is effective only until terminated, and it is subject to review and cessation should the Court determine that it is no longer "more likely than not" that the alien would be tortured in the country to which removal has been deferred, or should the alien request that his deferral be terminated. **See** 8 C.F.R. § **1208.17(b)(2).** The Court may also remove the alien, at any time, to a third country where he is not likely to be tortured. **See id.**

### B. Definition of Torture

"Torture" is defined as "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person." **See** 8 C.F.R. § 1208.18(a)(1). The severe pain or suffering must be inflicted on the applicant, or a third person, for one of four purposes, specifically: (1) for obtaining "information or confession;" (2) for punishing an act that either the applicant has committed or is suspected of having committed; (3) for intimidation or coercion; or (4) "for any reason based on discrimination of any kind." **See id.** In addition, the "act must be directed against a person in the offender's custody or physical control." **See** 8 C.F.R. § **1208.18(a)(6).** Furthermore, the pain or suffering must be inflicted by the instigation of, or with the consent or acquiescence of a public official or other person acting in an official capacity. **See** 8 C.F.R. § 1208.18(a)(1). "Acquiescence" requires that the public official have prior awareness of the activity and "thereafter breach his or her legal responsibility to intervene to prevent such activity." **See** 8 C.F.R. § 1208.18(a)(7); see also **Matter of J-E-,** 23 I&N Dec. 291, 299 (BIA 2002). Finally, torture is an "extreme form of cruel and inhuman treatment," which does not include pain and suffering arising from lawful sanctions. **See** 8 C.F.R. § 1208.18(a)(2) and (3).

13

However, lawful sanctions do not include penalties that defeat the object and purpose of the **Convention Against Torture**. <u>See</u> **8 C.F.R. § 1208.18(a)(3)**; <u>J-E-</u>, **23 I&N Dec. at 299**.

In order to constitute torture, mental pain or suffering must be "prolonged." <u>See</u> **8 C.F.R. § 1208.18(a)(4)**. It also must be caused by the intentional or threatened infliction of severe physical pain or suffering, threatened or actual administration or application of mind altering substances or similar procedures, or threatened imminent death. <u>See</u> <u>**id.**</u> These causes or results can be directed towards the applicant or another. <u>See</u> <u>**id**</u>.

## IV.    <u>Findings of Fact</u>

Based on the totality of the evidence in this case, the Court finds that Respondent has met his burden in establishing that it is "more likely than not" he will be tortured if returned to Russia. Accordingly, the Court shall grant Respondent's request for Deferral of Removal.

The Court finds that Respondent's testimony was sufficiently detailed, internally consistent, and that it corresponds to the information provided in his I-589. Furthermore, cross-examination of Respondent did not raise any significant inconsistencies or omissions that would lead to a finding that Respondent is not credible. Additionally, the Court finds that the testimony of Respondent's father is amply supported by the evidentiary record which shows that Respondent was born in Groznyy, Chechnya and that he, his father, and his paternal grandparents are Jewish. Finally, the Court finds that Mr. Butkevich is a credible witness. His testimony that Respondent would "more likely than not" face torture because of anti-Semitism and anti-Chechen sentiment in Russia is borne out by the evidentiary record. Accordingly, the Court finds that there is no doubt that Respondent is Jewish and Chechen and that these factors make it "more likely than not" that Respondent would be tortured if returned to Russia

Respondent argues that if he is returned to Russia, he will be tortured by government officials, specifically the police for four reasons. First, Respondent will be targeted because of his criminal history in the United States. Second, Respondent will be vulnerable to torture because of the fact that he no longer has any close family in Russia who would be able to bribe the police or demand Respondent's release. Third, Respondent will be targeted because of his Jewish heritage. Fourth, Respondent will be vulnerable to torture because of his dark

complexion, evidencing his Chechen nationality.

Respondent presented a compelling witness who testified that the Russian police would be aware of Respondent's arrival because U.S. authorities would have to secure a passport on his behalf. He indicated that Russian police officers are notoriously underpaid and unprofessional. The witness added that police officers in Russia are under intense pressure to obtain confessions and that they often resort to torture in order to "solve" pending criminal cases. The witness stated that Respondent's criminal history coupled with his lack of support make Respondent a particularly vulnerable target for torture. The types of torture that Respondent could be subjected to include; beatings, electric shock, being handcuffed and hung from a rafter, and having a plastic bag placed over his head until he is forced to confess to a crime he did not commit.

The witness further testified that Respondent would also be subject to torture because of his Jewish heritage and his Chechen nationality. He stated that the police regularly resort to extortion to supplement their income and that this practice is sanctioned by higher ranking officials in order to obtain kickbacks. The witness stated that Respondent would be particularly vulnerable to extortion due to the fact that he has a Jewish name and a darker complexion than most Russians. Because of this, the Russian police would assume that Respondent is "illegal" and would attempt to extort money from him. When Respondent could not pay, he would be subjected to torture and forced to confess to a pending criminal case. Furthermore, because of recent terrorist incidents by Chechens, Respondent would be a target of suspicion due to his Chechen background.

The Government relies on the 2002 Department of State Country Report on Human Rights Practices in Russia to argue that it is highly speculative that Respondent would be subjected to torture if returned to Russia. However, there are numerous statements in the Report that refute this assertion. For example, the Report indicates that torture by the police is commonplace and that people from the Caucasus are particularly vulnerable to such abuse. Specifically, the Report states, "[t]here were credible reports that law enforcement personnel continued to torture, beat, and otherwise abuse detainees and suspects. Arbitrary arrest and detention, while significantly reduced by the new Code of Criminal Procedure, remained problems, as did police corruption." **See Exhibit 7, Tab E**. Additionally, the Report states that

15

"there were credible reports that law enforcement personnel frequently used torture to coerce confessions from suspects and that the Government often did not hold officials accountable for such actions." **See id.** Furthermore, the Report indicates that there was "...a pattern of police beatings, arrests, and extortion directed at persons with dark skin, or who appeared to be from the Caucasus..." **See id.** Moreover, "[t]here were credible reports from throughout the country that security forces regularly continued to single out persons from the Caucasus for document checks, detention, and extortion of bribes." **See id.** Finally, the State Department Report indicates that "[p]olice repeatedly beat, harassed, and demanded bribes from people with dark skin, or who appeared to be from the Caucasus..." **See id.**

The State Department Report goes on to indicate that anti-Semitism is rampant both in Russian society at large as well as at every level of Russian government. The Report indicates that "[t]he Government did not always respect the constitutional provision for equality of religions, and in some instances the authorities imposed restrictions on some religious groups. Societal discrimination, harassment, and violence against members of some religious groups remained problems." **See id.** The Report further states that "[a]nti-Semitic themes continued to figure in some local publications throughout the country, unchallenged by local authorities." **See id.**

Finally, the State Department Report indicates that anti-Chechen sentiment is widespread in Russia. The Report states, "[d]espite constitutional protections for citizens' freedom of movement, local governments restricted this right, in particular by denying local residency permits to new settlers from other areas of the country." **See Exhibit 7, Tab E.** Furthermore, "[c]itizens changing residence within the country, as well as persons with a legal claim to citizenship who decide to move to the country from other former Soviet republics, often faced great difficulties or simply were not permitted to register in some cities." **See id.** Moreover, "[p]olice demanded bribes when processing registration applications and during spot checks for registration documentation." **See id.** Finally, "...it was not unusual for darker-skinned persons to be stopped at random and for officers to demand bribes from those without residence permits." **See id.**

The State Department Report clearly shows that Russian society, as well as the

16

S E E * E X H I B I T * " 5 "

**U.S. Department of Justice**

Executive Office for Immigration Review

*Board of Immigration Appeals*
*Office of the Clerk*

---

*5201 Leesburg Pike, Suite 1300*
*Falls Church, Virginia 22041*

**OKONKWO, IGNATIUS UMEADI**
**INMATE #: 16057-265**
**INMATE HOUSING: FDC**
**EDC, 827 Forrest Avenue**
**Gadsden, AL 35901-0000**

**INS-Litigation Unit/OAK**
**P.O. Box 1128**
**Oakdale, LA 71463-1128**

Name: **OKONKWO, IGNATIUS UMEADI**

**A26-792-202**

Type of Proceeding: Removal

<u>D</u>ate of this notice: 07/08/2004

Type of Appeal: Case Appeal

Appeal filed by: **Alien**

Date of Appeal: 04/29/2004

### NOTICE -- BRIEFING SCHEDULE

o    Enclosed is a copy of the decision of the Immigration Judge.
o    Enclosed is a copy of the transcript of the testimony of record.
o    Appealing party is granted until 07/29/2004 to submit a brief to the Board of Immigration Appeals. The brief must be **RECEIVED** at the Board on or before this date.
o    Opposing party is granted until 07/29/2004 to submit a reply brief to the Board of Immigration Appeals . The brief must be **RECEIVED** at the Board on or before this date.

o    **Briefing schedule reset due to alien has been transferred to a different detention facility.**

**WARNING:**    If you indicated on the Notice of Appeal (Form EOIR-26) that you will file a brief or statement, you are expected to file a brief or statement in support of your appeal. If you fail to file the brief or statement within the time set for filing in this briefing schedule, the Board may summarily dismiss your appeal. *See* 8 C.F.R. § 1003.1(d)(2)(i)(E).

**FILING INSTRUCTIONS -- In General.**

**IMPORTANT: The Board of Immigration Appeals has included two copies of this notice. Please attach one copy of this notice to the front of your brief when you mail or deliver it to the Board, and keep one for records. Thank you for your cooperation.**

A fee is not required for the filing of a brief. Your brief must be RECEIVED at the Clerk's Office at the Board of Immigration Appeals within the prescribed time limits. It is NOT sufficient simply to mail the brief and assume your brief will arrive on time. We strongly urge the use of an overnight courier service to ensure the timely filing of your brief.

Use of an over-night courier service is strongly encouraged to ensure timely filing.

If the alien is represented by counsel at the appeal level, a Notice of Entry of Appearance as Attorney or Representative before the Board of Immigration Appeals (Form EOIR-27) must be filed with the Board.

If you have any questions about how to file something at the Board, you should review the Board's Practice Manual and Questions and Answers at www.usdoj.gov/eoir.

Proof of service on the opposing party at the address above is required for ALL submissions to the Board of Immigration Appeals -- including correspondence, forms, briefs, motions, and other documents.   If you are the Respondent or Applicant, the "Opposing Party" is the District Counsel for the DHS at the address shown above.  Your certificate of service must clearly identify the document sent to the opposing party, the opposing party's name and address, and the date it was sent to them.  Any submission filed with the Board without a certificate of service on the opposing party will be rejected.

Filing Address:

To send by courier or overnight delivery service, or to deliver in person:
    Board of Immigration Appeals,
    Clerk's Office,
    5201 Leesburg Pike, Suite 1300,
    Falls Church, VA 22041

    Business hours:  Monday through Friday, 8:00 a.m. to 4:30 p.m.

To mail by regular first class mail:
    Board of Immigration Appeals
    Clerk's Office
    P.O. Box 8530
    Falls Church, VA  22041.


**FILING INSTRUCTIONS -- Extension Request.**

Unless you receive a Board Notice granting your extension request, your brief will remain due on the date stated above.

Extensions of briefing time will only be granted for good cause.  All extension requests must be in writing.  Telephonic or fax requests will not be accepted.

Extension requests must be **RECEIVED** at the Board on or before the expiration of the initial briefing schedule.  Requests for extension of briefing time received after expiration of the initial briefing period, will not be granted.

The Board does not grant extensions for more than 21 days.  If your request is granted, the brief will generally be due 21 days from the date the initial briefing schedule expires, not 21 days from the date of the request for an extension or the date of the Board response to the request.  The new due date will be stated on the notice granting the extension.

The policy of the Board is that no additional extensions will be granted.